IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2004 Session

## NASHVILLE LODGING COMPANY, ET AL. v.
## METRIC PARTNERS GROWTH SUITE INVESTORS, L.P.

Appeal from the Chancery Court for Davidson County
No. 94-1911-II     Irvin H. Kilcrease, Jr., Chancellor

No. M2002-02356-COA-R3-CV - **Filed June 30, 2004**

Nashville Lodging Company and G.P. Credit Company, LLC appeal the action of the trial court in which the trial judge having previously granted Appellants' motion for summary judgment as to liability in this breach of contract action decided all issues as to damages in favor of Appellees. We affirm the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

Harry Buckley Cole, Marshall T. Cook, Nashville, Tennessee, for the appellants, Nashville Lodging Company and G.P. Credit Company, LLC.

Garry K. Grooms, Robert C. Goodrich, Jr., Nashville, Tennessee, for the appellee, Metric Partners Growth Suite Investors, L.P.

## OPINION

It is said that the greatest fear of the developers of the atomic bomb in Project Manhattan District was that splitting the uranium atom would produce an uncontrollable chain reaction. Fortunately for the world, these fears were unfounded. Such cannot be said for this case. The atom was split in1981 when Samuel H. Hardage met Kenneth E. Nelson. The resulting chain reaction, feeding upon itself, expanded exponentially to include (1) *Orlando Residence Ltd. v. Nashville Lodging Co.*, No. 01A-01-9606-CH-00256, 1996 WL 724915 (Tenn.Ct.App. Dec. 18, 1996) *perm. app. denied* (Tenn. 1997); (2)  *Metric Partners Growth Suite Investors, Inc. v. Nashville Lodging Co.*, 989 S.W.2d 700 (Tenn.Ct.App. 1998), *reh'g denied* (Tenn.Ct.App. 1998), *perm. app. denied* (Tenn. 1999); (3) *Orlando Residence, Ltd. v. Nashville Lodging Co.*, No. 01A01-9807-CH-00357A, 1999 WL 1040544 (Tenn.Ct.App. Nov. 17, 1999); (4) *Orlando Residence, Ltd. v. Nashville Lodging*

*Co.*, 104 S.W.3d 848 (Tenn.Ct.App. 2002), reh'g. denied (Tenn.Ct.App. 2002), *perm. app. denied* (Tenn. 2003); (5) *Nelson v. Metric Realty*, No. M2000-03204-COA-R3-CV, 2002 WL 31126649 (Tenn.Ct.App. Sept. 26, 2002), *perm. app. denied* (Tenn. 2003); (6) *Nashville Lodging Co. v. Metric Partners Growth Suite Investors, LP and Chris Komanoski*, Cir.Ct. Mil., WI, case no. 94-CV-001212 (Jan. 31, 1994); (7) *Metric Partners Growth Suite Investors, LP v. Nelson*, no. 92-8065 (Cal. Super. Ct., San Francisco filed Jan. 1991); (8) *Metric Partners Growth Suite Investors, LP v. Reuben;* no. 99-8214 (Cal. Super. Ct., San Francisco filed Sept. 1998.)

In an effort to avoid confusion concerning various separately named entities (mostly limited partnerships) the principal players in this continuing saga can be grouped into three armed camps, and, except where quotations from previous cases require otherwise, these camps will be referred to as follows:

1.     "Hardage" - - Samuel Hardage Agent, General Partner and Primary Investor in Orlando Residence Ltd.  This entity owned the Nashville property prior to construction of the Marriott Residence Inn thereon and, in the early 1980's, conveyed the Nashville property to Nashville Residence Corporation, accepting as part of the purchase price a $250,000 note executed by Nashville Residence Corporation.
2.     "Nelson" - - Kenneth E. Nelson, a Wisconsin resident who was principle stockholder of Nashville Residence Corporation; owner of Nashville Lodging Company, a limited partnership; principal stockholder of 2300 Elm Hill Pike, Inc.; and controlling figure of what may generally be categorized in this litigation as the Nelson entities.
3.     "Metric" - - Metric Partners Growth Suite Investors, L.P.  This limited partnership purchased the Nashville Marriott Residence Inn from Nashville Lodging Company in 1989 following a 1986 quitclaim conveyance of the Nashville property from Nashville Residence Corporation to Nashville Lodging Company.  Metric also owned a Residence Inn in Ontario, California, which had previously been managed by Kenneth Nelson and formed the predicate for litigation in California between Nelson and Metric.

There are times in the course of the litigation between all of these parties that one or more of the Nelson entities is separately referred to and where the name Hardage is used interchangeably with Orlando Residence Limited.  Likewise Metric is several times referred to as "GSI."  In the interest of clarity and understanding, these three warring camps will be generally referred to as "Hardage," "Nelson," and "Metric."

In a nutshell, this appeal involves the questions:

1.     Did the trial court err in granting summary judgment as to liability against Metric for breach of a settlement agreement reached in the California litigation?

2.     Did the trial court err in refusing to allow Nelson to amend his third party complaint?

3.     Did the trial court err in dismissing the claim of Nelson for indemnification as to claims asserted by Hardage?

4. Did the trial court err in limiting proof of damages so as to exclude Ken Nelson's claims for compensation?

5. Did the trial court err in ruling that certain attorney's memos were irrelevant and inadmissible?

6. Did the trial court err relative to the admissibility of evidence regarding mitigation of damages and failure to obtain lender consent to transfer of property?

Alas, this nutshell cannot provide a vehicle for a definitive ruling in this complex litigation. We must, therefore, embark upon a journey through 25 volumes of technical record consisting of 3261 pages together with voluminous exhibits, depositions, transcripts of hearings, and miscellaneous documents. Fortunately, much of the history of the case can be gleaned from previous opinions of this Court dealing with matters fully reflected in this record.

While the opinions of this Court in *Orlando Residence, Ltd. v. Nashville Lodging Co.*, 1999 WL 1040544, and *Orlando Residence, Ltd. v. Nashville Lodging Co.,* 104 S.W.3d 848, involve actions relative to fraudulent conveyances rather than the breach of a settlement agreement involved in the case at bar, the relevant facts remain the same, and we reassert:

> For the third time we find ourselves reciting the facts that precipitated this controversy. Since the facts have not changed, we adopt the relevant parts of our most recent opinion, *Orlando Residence, Ltd. v. Nashville Lodging Co., et al.*, No. 01A01-9807-CH-00357A, slip. op. at 1-3, 1999 WL 1040544 (Tenn. Ct. App. Nov. 17, 1999):
>
>> The seeds of the present dispute were sown in 1981 when Samuel H. Hardige (sic) hired Kenneth E. Nelson to oversee one of his businesses. Mr. Hardige (sic) fired Mr. Nelson a short time later, thereby precipitating considerable litigation between Mr. Nelson and various business entities owned by Mr. Hardige (sic). When the litigation was eventually settled, Nashville Residence Corporation ("Nashville Residence"), of which Mr. Nelson was the principal stockholder, received a tract of land at 2300 Elm Hill Pike in Nashville. In return, Nashville Residence and two sureties executed a $250,000 note to Orlando Residence, Ltd. ("Orlando Residence"), a limited partnership with Mr. Hardige (sic) as the general partner. (Footnote omitted). Thereafter Nashville Lodging Company ("Nashville Lodging"), a Tennessee-based limited partnership with Nashville Residence as its general partner, built a Marriott Hotel on the Elm Hill property.
>>
>> Nashville Residence defaulted on the note to Orlando Residence. In December 1986, Orlando Residence sued Nashville Residence in the United States District Court for the Middle District

of Tennessee. Shortly after Orlando Residence filed suit, Nashville Residence quitclaimed the Elm Hill property to Nashville Lodging. In 1989, Nashville Lodging sold the hotel and leased the property to Metric Partners Growth Suite Investors, L.P. ("Metric Partners"). In March 1990, Orlando Residence obtained a judgment in federal court against Nashville Residence for $250,000 plus interest.

Armed with its $250,000 judgment, Orlando Residence filed suit in the Chancery Court for Davidson County against Nashville Residence, Nashville Lodging, Mr. Nelson, and Metric Partners attacking the conveyance of the Elm Hill property as a fraudulent conveyance. Orlando Residence eventually succeeded with its claim and was awarded $501,934 in compensatory and $850,000 in punitive damages from Nashville Residence and Nashville Lodging. Both Nashville Residence and Nashville Lodging appealed to this court.

Orlando Residence decided to execute on its chancery court judgment while Nashville Residence's and Nashville Lodging's appeal was pending. In the summer of 1996, Orlando Residence moved to subject the Elm Hill property to an execution sale. Orlando Residence purchased the property for $100,000, and this sale was confirmed by the trial court. Three months later, this court reversed Orlando Residence's judgment and remanded the case for a new trial. *See Orlando Residence Ltd. v. Nashville Lodging Co.*, No. 01A01-9606-CH-00256, 1996 WL 724915, at *4-7 (Tenn. Ct. App. Dec. 18, 1996), *perm. app. denied concurring in results only* (Tenn. May 19, 1997).

With the fraudulent conveyance judgment now vacated, Nashville Lodging and Nashville Residence, not surprisingly, requested the trial court to set aside the execution sale of the Elm Hill property to Orlando Residence. They also requested the trial court to dismiss the case because Orlando Residence lacked standing to enforce the federal court judgment. The trial court declined to dismiss Orlando Residence's fraudulent transfer suit or to set aside the judicial sale. After several additional skirmishes, Nashville Residence and Nashville Lodging again appealed to this court.

Nashville Lodging also decided to try another legal tack after the trial court denied its motion to set aside the judicial sale. It filed a new action in the Chancery Court for Davidson County claiming that Orlando Residence was being unjustly enriched as a result of its purchase of the Elm Hill property at the judicial sale. This case was assigned to the trial court where Orlando Residence's fraudulent conveyance claim was pending. Accordingly, Nashville Lodging

asserted that it was entitled to return of the property and to restitution of all rents and profits received by Orlando Residence after the execution sale. (Footnote omitted). Orlando Residence swiftly moved to dismiss this lawsuit on res judicata grounds. On September 8, 1998, the trial court dismissed Nashville Lodging's complaint. Nashville Lodging Company perfected its second appeal to this court.

The dispute over the Elm Hill property took on a new dimension prior to the oral arguments in both appeals. Metric Partners defaulted on a promissory note it had signed as part of the 1989 conveyance of the property and purchase of the hotel. (Footnote omitted). The note was secured by a first mortgage on both the Elm Hill property and the hotel. Following the default, the holder of the note notified the parties that it intended to foreclose on and sell the Elm Hill property and the hotel. The foreclosure sale was conducted shortly after this court heard oral argument in the appeal involving Orlando Residence's fraudulent conveyance claim. WBL II Real Estate Limited Partnership purchased the Elm Hill property and the hotel for $9,050,000. The trustee of the deed of trust estimated that approximately $500,000 in excess proceeds would be distributed to the owner of the Elm Hill property after the existing indebtedness was satisfied.

The foreclosure sale ended any possibility that either Orlando Residence, Nashville Lodging, or Nashville Residence could recover possession of the Elm Hill property. Accordingly, following oral argument in its appeal from the trial court's dismissal of its unjust enrichment complaint against Orlando Residence, Nashville Lodging moved to dismiss its appeal from the dismissal of its unjust enrichment claim.

*Orlando Residence*, 104 S.W.3d at 850-52.

It is important to take notice of the effect on the present litigation of this Court's action in *Orlando Residence, Ltd. v. Nashville Lodging Co.*, No. 01A01-9606-CH-00256, 1996 WL 724915 at *4-7 (Tenn.Ct.App. Dec. 18, 1996), perm. app. denied concurring in results only (Tenn. May 19, 1997). In that proceeding the trial court (Chancellor Robert Brandt) had granted partial summary judgment to Orlando Residence, Ltd. thereby determining as a matter of law that the December 29, 1986 conveyance from Nashville Residence to Nashville Lodging was fraudulent. The chancellor based his findings on a certified copy of the federal court judgment, the deposition of Kenneth E. Nelson, and the answers of Nelson to certain interrogatories and on other documents. He then submitted the case to the jury for a determination of damages and punitive damages. This court held that the chancellor erred in granting partial summary judgment as to the fraudulent character of the December 29, 1986 conveyance. This court then remanded the case to the trial court for a new trial on all issues. As it affects the case at bar it makes no difference whether the December 29, 1986

conveyance was fraudulent or not. It was the continued pendency of the fraudulent conveyance action and the Hardage lis pendens on the Nashville property based upon the alleged fraudulent character of the conveyance that inhibited the marketability of the Nashville property and created the "title problems" involved in the California settlement agreement. Metro was not a party to the business transactions between Hardage and Nelson that led to the lis pendens on the Nashville property and could not be affected by the lis pendens except to the extent that the lien lis pendens constituted a lien upon the Nashville property securing Hardage for the Nelson debt to him. As Metro did not assume the lis pendens in the California settlement but rather took the Nashville land subject to the lis pendens Metro was a stranger to the Hardage-Nelson controversy. Since it was the December 29, 1986 conveyance and the lien lis pendens supporting the unresolved fraudulent conveyance battle between Hardage and Nelson that created all of the problems it is immaterial as far as the rights and obligations of Metro are concerned whether the conveyance was fraudulent or not, at least as long as the fraudulent conveyance issue remained unresolved.

These legal battles in Nashville primarily involved Hardage, Nelson, their respective entities and the Nashville Marriott Inn. Metric was not involved with the Nashville Marriott Inn until 1989, when it purchased from Nashville Lodging the Marriott Inn in Nashville and, at the same time, leased from Nashville Lodging the property on which the Marriott Inn was located.

During this same time frame, Metric and Nelson were not strangers to each other, as they were involved in various business arrangements with each other in California. In the late 1980's, Metric acquired certain Residence Inn hotels from entities controlled by Nelson. These acquisitions involved both the Residence Inn in Nashville and the Residence Inn in Ontario, California. After these acquisitions, Nelson continued to provide management services from April of 1988 to February of 1991 in the operation of the Residence Inn in Ontario, California. Metric determined that Nelson had breached his management agreement for the Ontario hotel, terminated the agreement with him and filed suit against him in the Superior Court of California at San Francisco in January 1991 seeking damages and declaratory relief. Nelson counter-claimed for damages, and so began the California litigation involved in California Superior Court case no. 92-8065.

As mid-year approached in1993, Metric found itself a party-defendant in the fraudulent conveyance actions asserted in *Hardage v. Nelson* (*Orlando Residence Ltd. v. Nashville Lodging Co., et al.*, 1996 WL 724915) in Nashville, although it was confident of its position as a "bonafide purchaser" without knowledge under its 1989 deed and lease of the Nashville property. At this same time it was seeking recovery from Nelson for alleged mismanagement of the Ontario hotel in California. Also, at this time, Nelson's financial condition appeared to be precarious. Trial date was approaching in California and two executive officials of Metric, Joseph D. Long and Chris Komanoski, wrote a memo to the Investment Advisory Committee of Metric advising:

> It is believed that GSI's case is very strong and it will prevail in court. A complete victory would entail judgment against all of the Nelson entities and Ken Nelson personally for the $194,000 plus all legal fees and expenses which, after trial, will total approximately $250,000.

Nelson currently has $2.5 million in judgments against him personally, including a $1.5 million judgment by the RTC. He has indicated that he is prepared to file personal bankruptcy if we prevail and vigorously pursue collection. Given what has been learned about Nelson during the case, this would seem like a logical move for him. If that occurred, we would stand in line as an unsecured creditor and hope to someday collect something on the judgment. There is no way of determining if and when we could collect. The judgments were entered against Nelson in December 1991. We were just informed of them last week. Why Nelson did not tell us sooner is a mystery as the mere existence of these judgments would give GSI greater motivation to settle. The only explanation is that Nelson acts irrationally. While we always knew that collection would be difficult, this information further inhibits collection prospects upon obtaining a favorable judgment.

*SETTLEMENT PROPOSAL*

Various settlement proposals have been discussed over the past year with the end result that Nelson is unwilling (and by his account, unable) to pay *any* money currently in order to settle this litigation. It is believed that *all* possible structures have been explored. However, the only asset which Nelson has which appears to have any value is his land lease on GSI's Nashville Residence Inn. We had explored the possibility of offsets against a settlement amount with monies paid to him under the lease but Nelson was not able to execute such a proposal due to partnership disputes in that entity. Nelson believes, however, that he can obtain approval to sell the land for $1.7 million and provide 100% financing at less than 6%, a substantial discount from the current and projected future Option Price and it is this that forms the basis of the settlement proposal. Below I will outline the terms of the current lease and the proposed changes. The attached analysis provides an assessment of the financial impact of this proposal.

| Lease Terms | | |
|---|---|---|
| | Current | Proposed |
| Comparable Cash Payments (over 5 years) | $119,000/yr. | $100,000/yr. |
| Deferred Rent Payments (5 years) plus interest | $371,890 | $0 |
| Extension Option | Floating rates x then current option price ($3.6M) less $100,000 for five (5) year terms | Same floating rate x $1.7M for 5 years |
| Extension Payment (today's rates) | $131,000 | $112,000 |

Option Price (in 1998)          $3.6 million                    $1.7 million

The ground lease option price bears no resemblance to the land value itself (in reality it is a second mortgage with a kicker and was structured as a ground lease solely for Nelson's tax benefit) and thus the escalating feature will likely exceed NOI growth, thereby minimizing the prospects for a buyout and refinance in 1998. Additionally, the lease goes to great pain to spell out emphatically that Nelson has the unfettered right to approve or reject an assignment of the lease, on sale or at any other time. This was due to the fact that, as stated above, the deal was in practical terms a second mortgage rather than a traditional ground lease. Thus, Nelson would likely inhibit any sale subject to the ground lease, thereby forcing a buyout.

It is believed that under the current lease structure, it will be difficult to buy out the land and/or refinance the existing first mortgage due largely to the fact that this property was 85% leveraged at the time of acquisition in 1989. In addition, the land lease option price escalator makes a land buyout seemingly unattainable in today's marketplace. This proposed transaction substantially improves the prospects for the successful outcome of the Nashville investment.

*LITIGATE vs. SETTLEMENT ANALYSIS*

Below is an outline of the range of likely outcomes under either scenario (litigate or settlement):

*Litigate*

1.      Successful judgment for approximately $450,000 which gets fully collected.
2.      Successful judgment for approximately $450,000 which gets mired in a Nelson bankruptcy and little, if any, gets collected and GSI spends dollars in collection efforts.
3.      Successful judgment for less than full amount with outcomes #1 or #2 applying.
4.      Nelson prevails in cross complaint and GSI has a substantial ($775,000) liability.
5.      In all of the above, additional litigation costs are approximately $40,000.

*Settlement*

1.      Nashville property performs exceptionally well so that a refinance of the now current lease option price would be achievable. GSI has windfall of $1.9 million, the difference between the current 1998 option price and the negotiated amount.

2.      Nashville performance is less than what would be necessary to refinance and buy out the land in 1998 under the current lease terms but the proposed structure enables a deal to take place versus potentially losing the property.

3.      Nashville's performance goes down from today's income levels by 1998 and GSI ultimately cannot refinance even the first mortgage, let alone buy out the land and loses the property. This would mean the settlement was ultimately unfavorable to GSI.

In addition to the above analysis, it is important to note that the extinguishing of the current lease has many advantages on its own. This lease is extremely complicated, is tied to the first mortgage and contains provisions which are substantially ambiguous and leading to the specific performance language relative to the Option Price buyout which could be construed as meaning that Nelson can force GSI to purchase the land at a specified (and inflated) price. Although I am certain that this was not the intent, Nelson's track record would indicate that this sort of ambiguity is an invitation for further litigation.

*CONCLUSION AND RECOMMENDATION*

Due to the complicated nature of the Ontario litigation, Nelson's poor financial condition, and the difficulty envisioned in collection if GSI prevails, it is believed that a negotiated settlement is a prudent approach. Because we are already engaged with Nelson in the Nashville property, approaching a settlement with that in mind is most sensible both in terms of ultimate collection, as well as for the purpose of minimizing further business dealings with him. It is believed that substantial value is being created in Nashville, possibly far in excess of the scope of the current litigation, if the economy grows even at modest rates. Thus, it is recommended that the above described settlement proposal is approved and that litigation is postponed, pending the successful documentation of this agreement. If documentation cannot, for any reason, be achieved, it is recommended that GSI continue to pursue Nelson through litigation.

*Nelson v. Metric Realty*, 2002 WL 31126649, at *4-6.

Metric accepted the Long-Komanoski recommendations and, on March 23, 1993, in open court before the Honorable William Cahill, Judge of the Superior Court of the State of California, entered a settlement agreement, as a part of which it agreed to purchase the land under the Nashville Marriott Residence Inn "as is."

The jolt to Metric came two weeks after the in-court settlement had been agreed to when Nashville attorney Alan Fister, representing Metric in the Nashville fraudulent conveyance litigation, addressed the following communication to Ms. Joyce S. Jaber, Vice President and Corporate Counsel of Metric Realty in Matco, California:

-9-

Dear Joyce:

At your request and the request of James A. Reuben, I have reviewed a Memorandum prepared by Mr. Reuben dated March 25, 1993, concerning an outline of major points of the settlement of a case involving Ken Nelson, pending in the San Francisco Superior Court, before the Honorable William J. Cahill. The core provision of this settlement appears to be a conveyance of the fee of the Nashville Residence Inn from Nashville Lodging Company to Metric Partners. Naturally, upon the conveyance of the fee, the current long-term ground lease would be merged into Metric Partners' title.

This contemplated conveyance to Metric Partners (hereinafter referred to as the "1993 Conveyance") is fraught with significant risk to Metric Partners, and I would recommend *against* this transaction. As you know, there is currently a fraudulent conveyance action pending in the Chancery Court for Davidson County, wherein Plaintiff (hereinafter referred to "Hardage") alleges that there are two fraudulent conveyances in the chain of title to the Nashville Residence Inn. Specifically, the first alleged fraudulent conveyance is a [sic] unrecorded quitclaim deed dated December 22, 1986, whereby title to the Inn was transferred from 300 Elm Hill Pike, Inc. (formerly Nashville Residence Corporation) to Nashville Lodging Company, a Wisconsin Limited Partnership. Both of these entities are Nelson-controlled entities. Hardage also alleges that the conveyances to Metric Partners in May 1989 are fraudulent conveyances.

We have filed a Motion for Summary Judgment, which we believe will absolve Metric Partners of any liability in the action pending in Davidson County, Tennessee. The essence of our Motion for Summary Judgment is that the *May 1989 Conveyance* to Metric Partners cannot as a matter of law be deemed "fraudulent." However, while Metric Partners may be absolved of liability, the fate of the Co-Defendants is uncertain.

It is our position that given the current circumstances, as long as we can prove the 1989 Conveyance was not "fraudulent," we will not be adversely affected even if the Court were to find that the 1986 Conveyance among the Nelson entities was "fraudulent." Our argument is that even if the 1986 Conveyance is rescinded, the only impact this would have upon Metric Partners is to substitute one Nelson entity for another as "Landlord." Thus, all of our rights and remedies pursuant to the ground lease would still be in full force and effect, and we would only be paying rent to a different entity. Even

if Hardage ultimately foreclosed, we believe our lease would still be valid, and we would pay rent to Hardage.

Our position is greatly buttressed by the fact that we are a "bona fide purchaser" without knowledge of the obligations between the Nelson and Hardage entities at the time of the 1989 Conveyance. Furthermore, our Affidavits clearly indicate that we had no suspicion of any fraudulent intent on the part of Nelson when we acquired title in 1989, and that we were not acting in concert with Nelson to hinder, delay or defraud his creditors.

If the 1993 Conveyance occurs, then we certainly cannot raise the argument regarding said conveyance that we were a "bona fide purchaser" without notice of the disputes between Nelson and Hardage. Furthermore, I am almost certain the Plaintiff would argue that we were now conspiring with Nelson in order to delay, defraud and hinder the creditors of Mr. Nelson and his entities. If the Judge finds that the 1986 deed was a fraudulent conveyance, then he could also find the 1993 Conveyance to be "fraudulent." If so, we would loose [sic] title to the premises. Furthermore, because our lease would have been merged into the 1993 deed, we would lose the benefit of the long-term ground lease.

In sum, without the 1993 Conveyance, we believe a "worst case" scenario would merely substitute one Landlord for another concerning the long-term ground lease. On the other hand, the worst case scenario with the 1993 Conveyance could result in Metric Partners losing both the fee and the ground lease. Furthermore, I seriously doubt that you could get title insurance to cover the 1993 Conveyance.

*Nelson*, 2002 WL 31126649 at *6-7.

A good synopsis of what happened is stated in the opinion of this Court in the case in which Nelson sued Long and Komanoski, together with other Metric officers, for allegedly inducing Metric to breach the settlement contract.

The litigation in California and the litigation in Tennessee were running essentially parallel courses. It is obvious that the left hand of GSI in San Francisco did not know what the right hand of GSI was doing in Nashville and vice versa. The left hand of GSI in California, acting in accordance with the Long-Komanoski Memorandum of March 23, 1993 settled, in open court, the San Francisco litigation with Kenneth Nelson. On April 7, 1993, the right hand of GSI in Nashville, delivered to the left hand in California, the Fister Memorandum, pointing out the disastrous consequences to GSI that would result in Nashville by consummation of the California settlement

agreement. Armed with the Fister Memorandum, albeit it too late to un-ring the bell of the California March 23, 1993 settlement, these defendants, acting for GSI, chose the lesser of two evils and on their collective recommendations, GSI breached the California settlement agreement and opened the door for a breach of contract action by Nelson. Indeed, Nelson exercised his right of action against GSI for breach of the California settlement agreement by filing a third party complaint against GSI in *Orlando Residence, Ltd. v. 2300 Elm Hill Pike, Inc., Nashville Lodging Co., and William Rosenburg, Trustee,* Dav. Chancery No. 94-1911-1.[1] On February 9, 1996, Chancellor Irvin Kilcrease granted summary judgment to Nelson on the third party complaint and determined, as a matter of law, that GSI had breached the California settlement agreement by failing to purchase the land. Damage issues were left to be tried in the future.

*Nelson*, 2002 WL 31126649, at *12.

So here we are.

The first issue to be addressed is raised by the cross-appeal of Metric wherein it is asserted that Chancellor Kilcrease erred in granting, on February 9, 1996, summary judgment to Nelson as to the issue of liability, thereby determining that Metric had breached the California settlement agreement as a matter of law. It is now necessary to determine exactly what the California settlement was.[2] This settlement is reflected by the transcript of the proceedings before Judge Cahill in California on March 23, 1993, relevant portions of which provide:

> THE CLERK: THIS IS METRIC VERSUS NELSON, 928065.
> THE COURT: CAN I HAVE APPEARANCES, AND I NEED EVERYONE IN THE COURTROOM, AND WE'LL GO FROM LEFT TO RIGHT.
> MR. NELSON: KEN NELSON, ONE OF THE DEFENDANTS.
> MR. PERILLAT: ALEXIS PERILLAT, JR., CO-COUNSEL FOR DEFENDANTS.
> MS. SCHLICHT: JANE SCHLICHT, COUNSEL FOR DEFENDANTS.
> MR. REUBEN: JAMES REUBEN OF REUBEN AND CERA, FOR METRIC PARTNERS GROWTH SUITE INVESTMENTS, THE PLAINTIFF.
> MR. LONG: JOSEPH LONG.
> MR. YODOWITZ: JOEL YODOWITZ.
> MR. KOMANOWSKI: CHRIS KOMANOWSKI.

---

[1] This case is, of course, the case at bar.

[2] In considering the California settlement of March 23, 1993, one must keep in mind that the left hand of Metric in California was acting in conformity with the Long-Komanoski Memorandum and was ignorant of the problems in Nashville faced by the right hand of Metric, which problems only surfaced in California two weeks after the settlement and were reflected in the April 7, 1993 Fister letter.

THE COURT: THANK YOU.

WE'VE BEEN IN SETTLEMENT DISCUSSIONS SINCE YESTERDAY, AND I UNDERSTAND FROM COUNSEL THAT THERE IS A SETTLEMENT THAT YOU HAVE ALL REACHED.

MR. REUBEN: THAT'S CORRECT, YOUR HONOR.

JAMES REUBEN SPEAKING.

WE DO HAVE THE OUTLINE OF A SETTLEMENT. WE'RE CERTAINLY GOING TO HAVE TO PUT TOGETHER RATHER EXTENSIVE DOCUMENTATION TO FINALIZE THE DEAL, BUT WE ARE PREPARED TO PUT THE PRINCIPAL POINTS OF THAT SETTLEMENT ON THE RECORD SO THAT EVERYONE HAS A RECORD, INCLUDING THE COURT, OF WHAT WE AGREED TO TODAY.

THE COURT: I WANT THIS IN SUCH A FORM SO THAT THE SETTLEMENT CAN BE ENFORCED IF YOU CANNOT AGREE ON SOME OF THE TERMS OF THE MINUTIAE OF THE SETTLEMENT AGREEMENT. WE WANT SOMETHING THAT CAN BE ENFORCED BECAUSE THIS ISN'T WORTH THE EFFORT OR THE COURT REPORTER PAPER IF IT ISN'T ENFORCEABLE.

MR. REUBEN: IT'S BEEN OUR EFFORT - - WE HAVE BEEN WORKING TOWARD GETTING IT TO THAT POINT, AND WE DO THINK WHEN WE OUTLINE THE PRINCIPAL POINTS THAT WE WILL HAVE AN ENFORCEABLE DOCUMENT OR ENFORCEABLE AGREEMENT AMONG THE PARTIES THAT THEN HAS TO BE REDUCED TO WRITING.

THE COURT: BUT I WANT IT UNDERSTOOD THAT UNDER CCP 664.6, WHEN YOU HAVE AN ORAL AGREEMENT BEFORE THE COURT, IT'S GOING TO BE ENFORCEABLE AND THAT'S WHAT WE HAVE BY THE TIME WE'RE DONE HERE. THAT'S WHAT THE COURT WANTS.

IS THAT WHAT WE'RE GOING TO GET?

MR. REUBEN: YES, YOUR HONOR.

THE WAY IN WHICH WE'RE GOING TO TRY TO PROCEED IS TO HAVE ME READ INTO THE RECORD A POINT, AND THEN IF THERE ARE COMMENTS FROM THE DEFENDANTS' SIDE, THEY WILL MAKE THOSE COMMENTS. I WILL TRY TO BE AS THOROUGH AS I CAN ON EACH POINT.

. . . .

THE DEAL IS AS FOLLOWS: LAND IN NASHVILLE WHICH IS PRESENTLY LEASED FROM NASHVILLE LODGING COMPANY TO THE PLAINTIFF, WILL BE SOLD FROM NASHVILLE LODGING COMPANY TO THE PLAINTIFF, AND THE LEASE, THE EXISTING LEASE, WILL BE SIMULTANEOUSLY TERMINATED.

THE LAND WILL BE SOLD ON THE FOLLOWING TERMS AND CONDITIONS:

ONE, $1.7 MILLION PURCHASE PRICE TO BE EVIDENCED BY A NOTE AND DEED OF TRUST THAT WILL BE EITHER IN A SECOND OR THIRD POSITION TO BE DETERMINED BY THE PARTIES.

TWO, THE NOTE WILL BE NON-RECOURSE TO THE BUYER.

THREE, THE INTEREST RATE WILL BE AN AMOUNT CALCULATED SO THAT INTEREST-ONLY PAYMENTS WILL EQUAL $100,000 PER YEAR. WE BELIEVE THAT'S ABOUT 5.8%, BUT WE'LL DO THAT CALCULATION.

MS. SCHLICHT: YOUR HONOR, SO IT'S CLEAR, I WAS GOING TO ADDRESS A POINT AS IT AROSE. IT'S CLEAR THAT THE INTEREST PAYMENT SHALL BE MADE IN CASH TO NELSON LODGING.

MR. REUBEN: I THINK THAT GOES WITHOUT SAYING.

MR. LONG: YES.

MR. REUBEN: YES.

THE COURT: "CASH" MEANS - -

MR. REUBEN: READILY AVAILABLE FUNDS. I'M NOT SURE WHAT THEY'RE REFERRING TO, MAYBE THAT WE WERE GOING TO OFFSET IT AGAINST SOMETHING, BUT THAT'S NOT - -

THE COURT: IT ISN'T DOLLAR BILLS OR CERTIFIED CHECKS BUT CASH PAYMENT BY CHECK OR DRAFT.

MR. PERILLAT: READILY AVAILABLE.

MR. REUBEN: THERE WILL BE NO DOWN PAYMENT. THE NOTE AND THE DEED OF TRUST, THE NOTE SECURED BY THE DEED OF TRUST WILL BE ALL DUE AND PAYABLE ON THE SAME DATE AS THE EXISTING WRAP MORTGAGE, A DOCUMENT WITH WHICH WE ARE ALL FAMILIAR.

THE PURCHASE OF THE LAND IS AS IS. WE - -

MS. SCHLICHT: IT'S AS IS, INCLUDING BUT NOT LIMITED TO TITLE ISSUES.

MR. REUBEN: THAT'S CORRECT, AND I'M GOING TO TALK SLIGHTLY MORE ABOUT THOSE AS I GO THROUGH THIS.

THE NEXT MAJOR POINT, WE UNDERSTAND THAT MR. NELSON OR HIS ENTITIES WILL CONTINUE TO BE OBLIGATED TO PERFORM ON A WRAP MORTGAGE, AND WE EXPECT THAT HE WILL CONTINUE TO PERFORM ON THAT WRAP MORTGAGE, WHICH OBLIGATION WILL BE EVIDENCED BY DOCUMENTATION SUFFICIENT TO METRIC, AND WE WILL CONTINUE TO PAY HIM THE DIFFERENCE BETWEEN THE UNDERLYING NOTE AND THE WRAP NOTE, WHICH IS ABOUT $4300 A MONTH, I BELIEVE.

MS. SCHLICHT: IT'S 4167.

MR. REUBEN: THAT'S CLOSER.

THE COURT: IN CASE THERE IS AN ARGUMENT SOME DAY, THE NUMBER IS 4167; CORRECT?

MS. SCHLICHT: THAT'S CORRECT.

-14-

MR. REUBEN: I'LL DO THIS FOR MY PARTY. METRIC AGREES THAT IT'S 4167.

. . . .

GOING SLIGHTLY OUT OF ORDER, BECAUSE THAT'S THE WAY OUR NEGOTIATIONS TOOK PLACE OUT IN THE HALLWAY, BUT I THINK WE'LL GET IT ALL ONTO THE RECORD AND WORK IT OUT IN OUR DOCUMENTATION, THE NEXT MAJOR POINT, ALL PARTIES UNDERSTAND THAT THERE ARE THIRD-PARTY ISSUES OUTSIDE THE PRESENT CONTROL OF THE PARTIES TO THIS LITIGATION THAT COULD CONCEIVABLY PRECLUDE PERFORMANCE OF THIS DEAL OR TRANSACTION, IN WHICH CASE WE UNDERSTAND THAT THIS COURT WILL RETAIN JURISDICTION TO FURTHER CONSIDER THE SETTLEMENT AND/OR SET FOR TRIAL ON A DATE ACCEPTABLE TO THE COURT.

THE COURT: WHAT THIS COURT WILL DO IF THERE IS A PROBLEM WITH SOMETHING OUTSIDE BY A THIRD-PARTY PROCEEDING OR SOMETHING OUTSIDE THE CONTROL OF THESE PARTIES THAT PREVENTS THIS SETTLEMENT FROM ACTUALLY OCCURRING, THIS COURT WILL HEAR ANOTHER SETTLEMENT CONFERENCE, MAKE EVERY EFFORT TO GET THIS CASE SETTLED, AND IF FOR SOME REASON IT'S JUST IMPOSSIBLE TO DO SO, BUT ONLY AS A RESULT OF WHAT SOMEBODY OUTSIDE THE CASE HAS DONE, THIS COURT, DEPARTMENT 10, WILL RETAIN JURISDICTION OVER IT.

MR. REUBEN: THAT'S WHAT THE PARTIES UNDERSTAND.

THE COURT: BUT IF SOMEBODY INSIDE THIS AGREEMENT DOES SOMETHING THAT ISN'T ACCEPTABLE, THE COURT WILL ENFORCE THIS SETTLEMENT.

MR. REUBEN: IF THE LATTER WERE TO OCCUR, I'M SURE THAT THE AGGRIEVED PARTY WILL BE BACK TO THIS COURT REQUESTING SOME HELP.

THE COURT: I'LL BE HERE.

. . . .

PERHAPS BEST, ALL LITIGATION IN THIS CASE WILL CEASE PENDING THE COMPLETION OF THE DOCUMENTATION TO COMPLETE THE SETTLEMENT. THE PARTIES UNDERSTAND THAT DISCOVERY IS CLOSED AND HAS BEEN CLOSED ACTUALLY BY LAW SINCE 30 DAYS BEFORE THE TRIAL.

THE COURT: THIS CASE IS SETTLED, AND THERE ARE NO FURTHER PROCEEDINGS. THE ONLY THING THAT CAN HAPPEN IS THAT YOU CAN COME BACK TO ENFORCE THE SETTLEMENT OR COME

BACK AND EXPLAIN TO THE COURT WHY THE THIRD PARTY HAS INTERFERED SOMEHOW WITH THE COMPLETION OF THE SETTLEMENT. THIS CASE, AS FAR AS THE COURT IS CONCERNED, IS OVER.

. . . .

THE COURT: THERE ARE NO HOLD HARMLESS, NO INDEMNITIES. HAS ANYBODY DISCUSSED THAT?

MR. REUBEN: WE HAVEN'T DISCUSSED IT, YOUR HONOR.

THE COURT: WHAT DO YOU THINK THE ANSWER IS?

MR. REUBEN: THERE WILL PROBABLY BE NO HOLD HARMLESS OR INDEMNITIES. I WOULD LIKE A CHANCE TO DISCUSS IT.

MS. SCHLICHT: I'M NOT AWARE OF ANY, BUT I'M NOT AWARE OF THE UNDERLYING DOCUMENTATION ON THE WRAP.

MR. REUBEN: WE'RE OKAY WITH THAT. WE WILL RELEASE, NO HOLD HARMLESS, NO INDEMNITY.

MS. SCHLICHT: LIKEWISE, WE HAVE NO PROBLEM WITH THAT.

THE COURT: AGREED.

MS. SCHLICHT, YOU HAVE DISCUSSED THIS WITH YOUR CLIENTS?

MS. SCHLICHT: CORRECT.

THE COURT: MR. NELSON, DO YOU UNDERSTAND THIS SETTLEMENT?

MR. NELSON: I BELIEVE I DO.

THE COURT: WELL, DO YOU HAVE ANY QUESTIONS? NOW IS THE TIME TO SPEAK UP. THE QUESTIONS I'M GOING TO ASK YOU, DO YOU UNDERSTAND IT? DID YOU DISCUSS IT WITH YOUR LAWYERS? DID YOU DISCUSS IT WITH EVERYONE YOU NEED TO, AND DO YOU FREELY UNDERSTAND IT AND FREELY ENTER INTO THE AGREEMENT?

MR. NELSON: WITHOUT BEING EVASIVE, I THINK I UNDERSTAND IT, YES.

THE COURT: THAT IS EVASIVE. I NEED TO KNOW THAT YOU DO UNDERSTAND IT, AND YOU DO AGREE TO IT. IF YOU HAVE A QUESTION, TALK TO YOUR LAWYERS, AND LET'S GET IT WORKED OUT. I DON'T WANT TO READ IN THE RECORD LATER, "I THINK I UNDERSTAND IT."

MR. PERILLAT: YOUR HONOR, IF I MAY, MR. NELSON'S HESITATION WAS BASED UPON HIS LACK OF FAMILIARITY WITH SECTION 1542 AND 664.6, WHICH I HAVE EXPLAINED TO HIM, AND HE IS NOW READY TO RESPOND.

THE COURT: HAVE YOU DISCUSSED IT WITH YOUR LAWYERS AND DO YOU AGREE TO THE SETTLEMENT?

MR. NELSON:          YES.

THE COURT:          DO YOU UNDERSTAND THE SETTLEMENT?

MR. NELSON:          YES.

THE COURT:          MS. SCHLICHT, ON BEHALF OF EVERYONE ELSE THAT YOU REPRESENT, HAVE YOU DISCUSSED IT WITH THEM, AND DO YOU HAVE AUTHORITY TO ENTER INTO THE AGREEMENT ON THEIR BEHALF?

MS. SCHLICHT:          YES.

THE COURT:          MR. REUBEN?

MR. REUBEN:          YES.

THE COURT:          HAVE YOU DISCUSSED ALL OF THIS WITH YOUR CLIENT?

MR. REUBEN:          YES, YOUR HONOR.

Crucial to the determination of whether or not the trial judge in Nashville properly granted summary judgment as to liability against Metric is the provision of the settlement:

MR. REUBEN:          . . . THE PURCHASE OF THE LAND IS AS IS. WE - -

MS. SCHLICHT:          IT'S AS IS, INCLUDING BUT NOT LIMITED TO TITLE ISSUES.

MR. REUBEN:          THAT'S CORRECT, . . .

Aside from the fact that this language is unambiguous, Metric and all other parties clearly understood the meaning as is evidenced by the March 25, 1993 Memorandum of James A. Reuben to Joyce S. Jaber outlining the settlement. This memorandum stated in part: "(f) The purchase shall be 'as is' with respect to title issues about which Metric has been made aware."

Since the right hand of Metric, at this very time, was vigorously defending the suit by Hardage to set aside the alleged fraudulent conveyances made by Nelson to it in 1989, Metric cannot disclaim knowledge of this title problem, as Metric cannot divide itself into component parts. What was intended by the settlement and what was the avowed intention of Judge Cahill is indisputable.

THE COURT:          I WANT THIS IN SUCH A FORM SO THAT THE SETTLEMENT CAN BE ENFORCED IF YOU CANNOT AGREE ON SOME OF THE TERMS OF THE MINUTIAE OF THE SETTLEMENT AGREEMENT. WE WANT SOMETHING THAT CAN BE ENFORCED BECAUSE THIS ISN'T WORTH THE EFFORT OR THE COURT REPORTER PAPER IF IT ISN'T ENFORCEABLE.

MR. REUBEN:          IT'S BEEN OUR EFFORT - - WE HAVE BEEN WORKING TOWARD GETTING IT TO THAT POINT, AND WE DO THINK WHEN WE OUTLINE THE PRINCIPLE POINTS THAT WE HAVE AN ENFORCEABLE DOCUMENT OR ENFORCEABLE AGREEMENT AMONG THE PARTIES THAT THEN HAS TO BE REDUCED TO WRITING.

THE COURT:         BUT I WANT IT UNDERSTOOD THAT UNDER CCP 664.6, WHEN YOU HAVE AN ORAL AGREEMENT BEFORE THE COURT, IT'S GOING TO BE ENFORCEABLE AND THAT'S WHAT WE HAVE BY THE TIME WE'RE DONE HERE. THAT'S WHAT THE COURT WANTS.

IS THAT WHAT WE'RE GOING TO GET?

MR. REUBEN:         YES, YOUR HONOR..

With meticulous care Judge Cahill required the parties to the lawsuit, not merely their respective attorneys, to acknowledge in open court that they understood the terms of the settlement and that they agreed to the settlement.

California Code of Civil Procedure section 664.6 provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally *** before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement." Cal.Civ.Proc.Code § 664.6 (Supp. 2000). In construing this section of the Code, the California Supreme Court has held:

> Thus the statute requires the "parties" to stipulate in writing or orally before the court that they have settled the case. The litigants' direct participation tends to ensure that the settlement is the result of their mature reflection and deliberate assent. This protects the parties against hasty and improvident settlement agreements by impressing upon them the seriousness and finality of the decision to settle, and minimizes the possibility of conflicting interpretations of the settlement. (See *In re Marriage of Assemi, supra*, 7 Cal.4th at p. 905, 30 Cal.Rptr.2d 265, 872 P.2d 1190; *City of Fresno v. Maroot, supra*, 189 Cal.App.3d at p. 762, 234 Cal.Rptr. 353; *Datatronic Systems Corp. v. Speron, Inc., supra*, 176 Cal.App.3d at p. 1174, 222 Cal.Rptr. 658.) It also protects parties from impairment of their substantial rights without their knowledge and consent. (See *Blanton v. Womancare, Inc., supra*, 38 Cal.3d at p. 404, 212 Cal.Rptr. 151, 696 P.2d 645.)

*Levy v. Superior Court*, 896 P.2d 171, 175 (Cal. 1995).

While it would seem that Judge Cahill had left no room for further maneuver, such hopes were short lived. On April 7, 1993, came the Alan Fister bombshell, and Metric threw its engine into reverse.[3] However, the exhaustive efforts of Metric to convert the "as is" provision of the oral California Settlement Agreement into a non-existent ambiguity were to no avail. It is well to note at this point that the "as is" language pales into insignificance when compared with the real problem facing Metric as set forth in the Fister memo. As Mr. Fister stated:

---

[3] However one may characterize the litigious nature of these parties prior to the Fister memo, all seemed to, thereafter, adopt a perverse interpretation of the golden rule to the effect that one should "do unto others before they can do unto you."

If the 1993 Conveyance occurs, then we certainly cannot raise the argument regarding said conveyance that we were a "bona fide purchaser" without notice of the disputes between Nelson and Hardage. Furthermore, I am almost certain the Plaintiff would argue that we were now conspiring with Nelson in order to delay, defraud and hinder the creditors of Mr. Nelson and his entities. If the Judge finds that the 1986 deed was a fraudulent conveyance, then he could also find the 1993 Conveyance to be "fraudulent." If so, we would loose [sic] title to the premises. Furthermore, because our lease would have been merged into the 1993 deed, we would lose the benefit of the long-term ground lease.

In sum, without the 1993 Conveyance, we believe a "worst case" scenario would merely substitute one Landlord for another concerning the long-term ground lease. On the other hand, the worst case scenario with the 1993 Conveyance could result in Metric Partners losing both the fee and the ground lease. Furthermore, I seriously doubt that you could get title insurance to cover the 1993 Conveyance.

On February 9, 1996, Chancellor Kilcrease entered the Order in this case granting the Nelson Motion for Partial Summary Judgment as to the issue of Metric's liability for breach of the California Settlement Agreement. In this Order the Chancellor held:

The Settlement Agreement obligated Metric to purchase the land underneath the Nashville Residence Inn. Specifically, the Settlement Agreement provided, "Land in Nashville which is presently leased by Nashville Lodging Company to the plaintiff will be sold from Nashville Lodging Company to the plaintiff." The Settlement Agreement further obligated Metric to purchase the Nashville land "as is" for $1,700,000. At time of the Settlement Agreement the land was subject to a lien lis pendens of Orlando Residence, Ltd. relating to the fraudulent conveyance suit pending in Chancery Court of Davidson County, Part III. The Settlement Agreement obligated Metric to, "diligently and in good faith and responsibly and reasonably attend to the documenting of this settlement agreement."

Following the settlement, Metric refused to purchase the land as it had agreed to do and made no offer to perform its obligation to purchase the Nashville land before it refused to perform. Metric did nothing prior to August 27, 1993 to attend to the documenting of the Settlement Agreement and on that date denied the existence of the settlement agreement stating before a California court "we are of the opinion there is no settlement." Metric later argued that it refused to purchase the Nashville land because of "title problems" and because the agreement was not enforceable under the California statute of frauds. Both of Metric's arguments were rejected by the California court.

Based upon the foregoing and the entire record in this cause the Court finds there is no genuine issue of material fact, and Third-Party Plaintiffs are entitled to partial summary judgment as a matter of law. The Court concludes that Metric refused to purchase the land, failed to attend to the documenting of the settlement and

-19-

failed to release Mr. Nelson, as it had agreed to do. Metric's conduct amounted to a breach of the Settlement Agreement reached in March 1993, and third-Party Plaintiffs are entitled to partial summary judgment. The parties shall set this case for a hearing on damages and other relief to which Third-Party Plaintiffs may be entitled.

Whether summary judgment as to liability was properly granted to Nelson depends on events that occurred in California between the settlement of March 23, 1993 and June 28, 1994.

From the Fister Memorandum of April 7, 1993 until June 28, 1994, Metric insisted that there was something ambiguous about the "as is" language of the March 23, 1993 settlement. Judge Cahill, on June 28, 1994, entered an order re-settling what had already been settled. Judge Cahill held:

> The parties agreed that the only issue remaining before the court relates to the Hardage liens. The specific question presented to the Court was whether the plaintiff agreed to purchase the Nashville property subject to the so-called "Hardage liens" during the oral settlement before the Court on the record held on March 23, 1993. After discussion with counsel and a review of the record before the court, the court finds that the only "Hardage lien" that is of concern to the parties is a lis pendens filed by Hardage against the Nashville property.

> According to the plaintiff, the plaintiff did not agree to purchase the Nashville property subject to the "Hardage liens." This argument is based on Mr. Reuben's statement on the record at the settlement that "there are third-party issues outside the present control of the parties to this litigation that could conceivably preclude performance of this deal or transaction. . ." The plaintiff argues that the "third party issues" referred to the Hardage litigation and that the plaintiff, therefore, did not intend to purchase the Nashville property until the lis pendens was removed.

> In support of its argument, the plaintiff cites to the April 27, 1994 deposition of defendant Nelson where Nelson was asked what his understanding was of the above quoted "third-party" language. Nelson's deposition answer, however, does not support the plaintiff's argument that the lis pendens needed to be removed in order for the settlement to go forward. Rather, Nelson's answer suggests that if Hardage "obtained an injunction to stop any conveyance of the subject property," then the settlement would be precluded.

> The Court's prior order that the settlement is to be enforced under C.C.P. §664.6 stands. The Court finds that plaintiff agreed to buy the property "as is, including but not limited to title issues," unless third party issues precluded performance of the deal or transaction. In the context of this case, plaintiff agreed to purchase the property unless an injunction or other action by a third party prevented the sale to plaintiff. A lis pendens does not prevent the transaction and, therefore, the Court finds that the plaintiff, in settling this case, agreed to purchase the Nashville property with the lis pendens filed against the property.

-20-

The "as is" language of the March 23, 1993 Settlement Agreement is not ambiguous, and its meaning was quite clear from the time it was entered.

That Metric clearly recognized that the "as is" language was not the real problem for them is established by the letter from James A. Reuben to Judge Cahill of April 21, 1993, shortly after he received the Fister memo.

> At the hearing, and at page 11 commencing at line 15 of the transcript, my comments on the transcript reflect an awareness of ". . . third party issues outside the present control of the parties to this litigation that could conceivably preclude performance of this deal or transaction, in which case we understand that this Court will retain jurisdiction to further consider the settlement and/or set for trial on a date acceptable to the Court . . ." In the time that has transpired since March 23, 1993, we have investigated the "Nashville Litigation" and determined the scope of those third party problems.

> During the settlement negotiations, the local representatives of GSI who appeared at the settlement conference were aware of pending litigation in Nashville, Tennessee, in which GSI had been named as a party. I am relatively certain that Mr. Nelson's recitation of the facts of the Nashville Litigation would differ, and by copy of this correspondence, he is invited to respond. Simply stated, the plaintiff in Nashville ("Hardage") was the owner of a promissory note and subsequent judgment against Mr. Nelson and certain Nelson entities in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (now approximately Four Hundred Fifty Thousand Dollars ($450,000.00)). The Nashville Marriott Residence Inn was conveyed to GSI by transfer in fee of the improvements and a transfer of the leasehold interest as to the land during the period of time that the judgment was pending. Hardage has sued in the Nashville Litigation alleging two prior fraudulent conveyances and naming GSI as a party to the second conveyance. When the Nashville Litigation was commenced, GSI tendered to their title insurance carrier. The title insurance carrier accepted the tender and retained a local law firm to represent the interests of GSI in that litigation. For your general reference, I have enclosed a copy of the complaint filed in the Nashville Litigations as Exhibit B.

> At such time as the settlement negotiations concluded in the San Francisco Superior Court, the in house counsel for GSI, Joyce S. Jaber, Esq., contacted the title company appointed counsel in Nashville to determine what appropriate steps should be taken to implement the settlement. Attached to this letter and marked as Exhibit C is a copy of correspondence dated April 7, 1993, addressed from Alan T. Fister, Esq. to Joyce S. Jaber, Esq., which is provided without waiver of any attorney/client privilege. Subsequent to receipt of that correspondence, Ms. Jaber and I engaged in a series of telephone conversations with Mr. Fister. I understand that Mr. Fister has also contacted Mr. Nelson's lawyers in the Nashville litigation to confirm the advice provided in his April 7, 1993 letter.

Briefly, Mr. Fister flatly advises against the transaction in its present form. As the situation now stands, GSI is being defended by its title insurance carrier without reservation. In the event that Mr. Hardage is successful in the Nashville Litigation, the title insurance carrier will be responsible to GSI to deliver title to the real property with respect to the fee and leasehold interests presently held by GSI - - probably by satisfying Mr. Hardage's money demands. It should be noted that in its present posture, Hardage cannot prove a claim that GSI was knowledgeable of Mr. Nelson's problems with Hardage or that GSI participated in or actually intended to hinder, delay or defraud the creditors of Mr. Nelson. The title company appointed attorney is confident that GSI will prevail on its bona fide purchaser ("BFP") defense.

However, as Mr. Fister describes in his April 7, 1993 letter, in the event that the land transaction contemplated by the settlement is completed, all of the title to the Nashville Marriott Residence Inn, including the presently held leasehold estate, will be held in the name of GSI. More importantly, GSI will no longer be able to continue to claim BFP status because of the obvious knowledge by virtue of participation in the Nashville Litigation. Mr. Fister is all but certain that the Hardage will amend his complaint in the Nashville Litigation to allege this additional transaction as a third fraudulent conveyance. In that event, if Hardage were successful, the series of conveyances including this last transfer of the land, could be unwound thereby leaving GSI with nothing in Nashville-a position worse than before the settlement on the Ontario litigation was entered into. That result is especially ironic in that the Nashville relationship had nothing to do with the Ontario litigation which was the subject of the settlement. It is and has been GSI['s intent to try to find a way to settle problems with Mr. Nelson in Ontario that led both parties to the Nashville Marriott Residence Inn. Other than by virtue of the settlement discussions, the Nashville property would not have become enmeshed in the San Francisco Superior Court action.

Importantly, GSI has also been advised by Mr. Fister that the title insurance carrier will not insure the settlement transaction, thereby leaving GSI's entire Twelve Million Dollar ($12,000,000.00) investment in Nashville at risk. On the other hand, absent the transfer of the land, even if the prior transfers were found to be fraudulent and were to be rescinded by the Nashville courts, the only impact on GSI would be to substitute Mr. Hardage for Mr. Nelson as the land lessor, keeping in mind that the title insurance carrier would remain responsible to protect the interests of GSI.

GSI continues to desire to acquire the land and would prefer to terminate all relationship with Mr. Nelson. However, without some additional protection, it appears that at minimum, GSI would be trading one piece of litigation for another and, more significantly, GSI could be placed in a worse position than before the settlement because of the substantial increased risk of loss of another property in Nashville, complicated by the loss of continuing title insurance to defend the interests

of GSI in Nashville. Settling one piece of litigation only to become involved in another that is fraught with significant risk is not appealing.

I am certain that Mr. Nelson or his counsel will point to the transcript at page 10, line 11, where GSI agreed that the purchase of the land is "as is." Indeed, at the time of the settlement negotiations, GSI was aware of the Nashville Litigation and further understood that the impediment to title resulting from the Nashville Litigation would, during the pendency of the Nashville Litigation, preclude any sale, refinancing or other hypothecation of the property. While GSI understood that there would be a title impediment affecting the ownership of that real property, GSI did not anticipate a situation where the Nashville Marriott Residence Inn could be lost, in its entirety.

The problem had nothing to do with "third party" problems. Under California law, the vendee of an "as is" sale cannot win in the absence of fraud or misrepresentation. Not even an adverse jury verdict can survive the vendor's motion for judgment notwithstanding the verdict in the absence of a finding of fraud or misrepresentation.

As the trial court correctly stated, any sale of property "as is" is a sale of the property in its "present or existing condition"; the use of the phrase "as is" relieves a seller of real property from liability for defects in that condition. The only exception to this principle is when a seller, through fraud or misrepresentation, intentionally conceals material defects not otherwise visible or observable to the buyer. (*Lingsch v. Savage, supra*, 213 Cal.App.2d at pp. 740-742, 29 Cal.Rptr. 201.) Appellants have cited no cases, nor have we found any, in which a person selling real property "as is" was liable for defects in the quality or condition of the real property, where the property was not new construction, and the sale was made in good faith and without some form of fraudulent misrepresentation or concealment. Here, the jury found that respondents had committed no fraud or misrepresentation in the sale of the subject property; the trial court expressly agreed with that finding, which was supported by substantial evidence in the record. Thus, in the absence of fraud or misrepresentation on the part of respondents, the mere fact that the bulge in the foundational wall was not readily observable does not render the "as is" condition on sale meaningless or inoperable in this case.

*Shapiro v. Hu*, 233 Cal.Rptr. 470, 476 (Cal.Ct.App. 1986). The rule in Tennessee is precisely the same. *See Jaffe v. Bolton*, 817 S.W.2d 19 (Tenn.Ct.App. 1991).

The left hand of Metric in California knew all about the Hardage lien on the Nashville property before entering into the March 23, 1993 settlement. The California representatives of Metric simply did not grasp the significance of the merger of title problem resulting from the contemplated purchase. The right hand of Metric in Nashville, however, knew all about the problem but was ignorant of the California settlement until after it was an accomplished fact. As to the existence of the Hardage liens in Nashville, it is nowhere even alleged by Metric that Nelson was guilty of fraud and misrepresentation or nondisclosure. Indeed, such considerations are hardly

imaginable since Metric was itself a defendant in the Hardage litigation in Nashville at the very time of the California settlement.

Certain matters are indisputable as of April 21, 1993, when Mr. Reuben forwarded his letter to Judge Cahill:

1) Nelson intended to convey the Nashville property to Metric "as is including but not limited to title issues."
2) Metric intended to take the conveyance from Nelson "as is including but not limited to title issues" in exchange for $1,700,000.00.
3) Metric knew that the Hardage lis pendens was properly filed as to the Nashville property and constituted a lien thereon.
4) The left hand of Metric in California did not understand the legal effect of such a transaction as it related to merger of title of the Nashville property.
5) The right hand of Metric in Nashville knew exactly what the legal consequences were of the transfer from Nelson to Metric of the Nashville property but was not consulted by the left hand of Metric prior to the March 23, 1993 settlement.

At this point, as far as is relevant to the case, everything came to a standstill in both California and Nashville while Metric pursued its forlorn effort before Judge Cahill to establish that the "as is" provision of the March 23, 1993 settlement was somehow ambiguous. This effort came to an end on June 28, 1994 when Judge Cahill held that there was no ambiguity in the provision. Chancellor Kilcrease was clearly correct in finding that Metric breached the settlement contract by refusing to purchase the Nashville property under the provisions of the March 23, 1993 settlement.[4]

The efforts of Metric to deny its deliberate breach of the California Settlement Agreement on the basis of the merger of title problem rings hollow when one considers the allegations of Metric's Complaint in its malpractice action against its former attorney, James Reuben in California.

> 10. As a further direct and proximate result of the negligence and carelessness of defendants, and each of them, METRIC agreed to purchase real property subject to encumbrances and liens and a lis pendens, without being advised of all potential consequences, and METRIC was damaged by being required to incur and pay attorney's fees and costs for legal services rendered, for both itself and others to whom it owed a duty of indemnification, in an effort to defend its interests, remedy the errors committed by defendants, and avoid and/or minimize the consequences of such errors, all in an amount to be established at the time of trial according to proof.

---

[4] Metric also sought, in vain, to assert before Judge Cahill that the March 23, 1993 Settlement Agreement required Nelson to remove the lis pendens filed by Hardage against the Nashville property before the sale could be consummated. Nothing in the agreement is susceptible of such an interpretation, and Judge Cahill so held in his Order of June 28, 1994.

11. As a further direct and proximate result of the negligence and carelessness of defendants, and each of them, METRIC has been sued in other litigation and as a consequence has been damaged in that it has been compelled to engage the services of new and additional counsel to represent its interests in a an effort to relieve it of further damages incurred as a result of said negligence and carelessness by defendants, and may incur other expenses and losses in connection therewith, said damages in an amount which, although presently unknown, is in excess of the jurisdictional minimum of this Court, said amount to be established at the time of trial according to proof.

*Metric Partners Growth Suite Investors, LP v. Reuben*, no. 99-8214. (Compl. at p. 4).

That the merger of title problem and not the "as is" language of the contract was the singular element prompting Metric to reverse gears relative to the California settlement is best stated by Metric representative Robert A. Fiddaman in his deposition as quoted in *Nelson v. Metric Realty*, 2002 WL 31126649, at *18.

> Q       My question is, why didn't Metric go ahead and purchase the property under the settlement agreement and then if it had some dire consequences go after those people who had advised Metric to enter into the deal?
> A       That would be a pretty stupid business decision.
> Q       Why?
> A       Why would you - - litigation has started out over less than $200,000 that was going to be settled by, you know, this land purchase deal about which I don't remember the economics of at all. Why would you put at risk a 12 million dollar investment in a totally unrelated property to try to settle the matter and then try to recoup that by suing people? That makes no sense at all. I would never make that business decision.

Holding Metric liable to Nelson as a matter of law for such damages as proximately resulted from the refusal of Metric to accept a conveyance of the Nashville property "as is" presents a problem that is by no means easy to resolve. What damages proximately resulted from the Metric breach of contract; and what damages proximately resulted from the "about-face" actions of Nelson after Metric belatedly offered to perform the contract following the June 28, 1994 order of Judge Cahill?

As far as this record shows, the status of the property in Nashville remained unaffected by events that occurred between March 23, 1993 and June 28, 1994. Aside from the Hardage lien lis pendens, which already affected the title at the time of the March 23, 1993 settlement, the next action affecting the title to the Nashville property did not occur until the summer of 1996 when Hardage moved to subject the Nashville property to an execution sale and, thereafter, purchased the property at such sale for $100,000.00. The reversal and remand of the Hardage fraudulent conveyance action, upon which the lis pendens depended, occurred on December 18, 1996. Earlier in 1996, Metric defaulted on the first mortgage encumbering the Nashville property. Foreclosure sale occurred and WBL II Real Estate Limited Partnership purchased both the Elm Hill property, which was the subject

-25-

of the ground lease, and the Nashville Marriott Residence Inn located thereon for a total of $9,050,000.00.

The trials and tribulations of Judge Cahill in California stagger the imagination. Counsel for parties with apparently endless financial resources surged forth in elaborate maneuverings marked by obstruction, evasion, equivocation and delay. If the beleaguered trial judge thought he had settled a case on March 23, 1993 and resettled it on June 24, 1994, he woefully underestimated the tenacity and resourcefulness of parties intent upon accomplishing assured mutual destruction.

A hearing before Judge Cahill was held May 24, 1995 with Kenneth Nelson appearing by telephone, with his attorneys, Jane Schlicht, Stephen Chernof and Alexis J. Perillat, Jr., in attendance in and with Metric represented by Scott Baker. The transcript of the hearing discloses:

> THE COURT: THE DATE YOU ALL STOOD IN FRONT OF ME AND ENTERED INTO THE SETTLEMENT. I KNOW YOU HAVE COME BACK A COUPLE TIMES, BUT IF I WERE GOING TO APPROVE THE SETTLEMENT, IT WOULD GO BACK TO THE DATE OF THE TIME THAT THERE WAS THE AGREEMENT.
>
> MR. BAKER: YOUR HONOR, ONE OF THE PROBLEMS WE HAVE, AND THE REASON WE RAISED THIS ISSUE IS, IT'S NOT CLEAR TO US - - AND MR. CHERNOF WAS POINTING TO TESTIMONY THAT WENT ON IN TENNESSEE A MONTH AGO - - IT IS NOT CLEAR TO US THAT MR. NELSON INTENDS TO PERFORM THIS SETTLEMENT AT ALL, GIVEN SOME OF HIS TESTIMONY THAT HE GAVE IN TENNESSEE, AND WE DON'T BELIEVE WE SHOULD BE SUBJECT, ONE, TO BOTH PERFORMANCE OF THIS DEAL AND THEN, TWO, DAMAGES WHEN IT'S NOT - - APPARENTLY NOT MR. NELSON'S INTENT TO GO FORWARD WITH THE SALE.
>
> THE COURT: THEN YOU HAVE AN ISSUE ABOUT WHETHER THERE WAS FRAUD IN THE INDUCEMENT, AND YOU CAN UNDO THE WHOLE THING.
>
> MR. BAKER: THAT'S THE - - YOUR HONOR, I SUPPOSE THAT'S TRUE, AND WE'RE GOING TO - - ALL WE'VE DONE IS FOSTERED FURTHER LITIGATION.
>
> THE COURT: NOT REALLY. YOU HAVE A LITTLE BIT, BUT YOU'RE NOT GOING TO BE FILING ANOTHER SUIT UNLESS I GET RUN OVER BY A TRUCK. YOU WILL ALL COME BACK HERE.
>
> MR. BAKER: BUT THE PROBLEM IS, YOUR HONOR, MR. NELSON HAS ALREADY FILED THOSE LAWSUITS. HE ALREADY FILED A LAWSUIT IN MILWAUKEE. HE JUST RECENTLY HAS THREATENED TO, IF NOT ACTUALLY FILED, A THIRD-PARTY COMPLAINT IN TENNESSEE. WE'VE GOT FOUR OR FIVE DIFFERENT LAWSUITS GOING ON RIGHT NOW, AS FAR AS I KNOW.
>
> THE COURT: MS. SCHLICHT, WHAT DO YOU THINK ABOUT THIS?

MR. CHERNOF:    I'M SORRY?

THE COURT:    IS JANE SCHLICHT THERE OR ANYBODY WHO CAN TALK ON YOUR SIDE?

MS. SCHLICHT:    PARDON ME:

THE COURT:    DID YOU HEAR WHAT MR. BAKER SAID?

MS. SCHLICHT:    ABOUT SHOULDN'T THAT BE SUBJECT TO PERFORMANCE AND DAMAGE AND THEN NELSON HAS FILED A SUIT? I HEARD THAT.

THE COURT:    LET ME TRY SOMETHING ELSE. DO YOU HAVE ANY RESPONSE TO THAT, COUNSEL?

MR. PERILLAT:    WELL, NUMBER ONE, YOUR HONOR, THE DATE OF THE RELEASE WAS THE DATE THAT WE WERE IN FRONT OF YOU. THAT WAS, I BELIEVE, PUT ON THE RECORD, AND EVERYBODY KNEW IT. THAT WAS A PARTING OF THE WAYS. I THINK --

THE COURT:    YOU WOULD AGREE THAT IF MR. NELSON DOES NOT GO THROUGH WITH THIS SETTLEMENT, THAT WE CAN JUST UNDO IT?

MR. PERILLAT:    IF HE DOES NOT GO THROUGH WITH THIS?

THE COURT:    YES.

MR. PERILLAT:    I THINK THAT'S A DIFFERENT ISSUE THAN OTHER LITIGATION, YOUR HONOR.

THE COURT:    THAT'S WHAT MR. BAKER STARTED OFF SAYING IS THAT HE BELIEVES MR. NELSON IS NOT GOING TO GO THROUGH WITH THE SETTLEMENT.

MR. CHERNOF:    YOUR HONOR, THIS IS MR. CHERNOF.

IN FACT, FRANKLY, I FIND IT ASTOUNDING THAT MR. BAKER WOULD SUGGEST THAT MR. NELSON DOESN'T WANT TO GO THROUGH WITH IT. OUR THOUGHTS ARE THAT METRIC DOESN'T WANT TO GO THROUGH WITH IT.

THE COURT:    I DON'T WANT TO GET INTO THIS AT ALL. I WILL JUST LET EVERYBODY KNOW THAT IF THE SETTLEMENT DOESN'T HAPPEN, AND IF THE PROPERTY ISN'T TRANSFERRED, AND ALL THESE OTHER THINGS AREN'T DONE, I'LL FIND OUT WHAT HAPPENED, AND WE'LL ADDRESS THAT.

MR. BAKER:    YOUR HONOR, IF I MAY, THIS IS FROM A TRANSCRIPT OF PROCEEDINGS IN TENNESSEE, CROSS-EXAMINATION OF KENNETH NELSON, AND THE QUESTION WAS ON PAGE 3 OF THIS TRANSCRIPT:

"WELL, SO THE PRICE, IF THE CLOSING WERE TO HAPPEN TOMORROW" - - AND THEY'RE TALKING ABOUT THIS SETTLEMENT - - "OR NEXT WEEK, WHENEVER, IT'S $1.7 MILLION; IS THAT CORRECT?"

"ANSWER:    I BELIEVE" - - THIS IS NELSON'S ANSWER - - "I BELIEVE THAT METRIC'S BREACH HAS EXCUSED THE

-27-

PERFORMANCE OF THE OTHER PARTIES TO THE SETTLEMENT AGREEMENT."

LATER ON PAGE 4 - -

THE COURT: WELL, LET ME - - I GOT TO - -

MR. BAKER: LET ME JUST PUT IT ON THE RECORD, IF I MIGHT, YOUR HONOR.

THE COURT: COUNSEL, I GOT TO MOVE THIS ALONG A LITTLE BIT.

ANYBODY IN WISCONSIN HERE, DO YOU KNOW ABOUT THIS, AND WHAT'S THE ANSWER TO IT?

MR. CHERNOF: FRANKLY, I CERTAINLY DON'T.

MS. SCHLICHT: YOUR HONOR, THIS IS JANE SCHLICHT. I OBVIOUSLY WAS NOT AT THAT TRIAL.

THE COURT: MR. NELSON WAS THERE. WHAT DO YOU HAVE TO SAY, MR. NELSON?

MR. NELSON: THIS IS KEN NELSON. MY UNDERSTANDING IS THAT METRIC REFUSED TO BUY THE LAND THEREBY BREACHING THE AGREEMENT, AND, AS I UNDERSTAND IT - - YOU KNOW, I'M NOT A LAWYER - - THAT MEANS THAT PERFORMANCE OF THE OTHER PARTIES IS EXCUSED.

THE COURT: ARE YOU GOING TO PERFORM?

MR. NELSON: WELL, IF A COURT FINDS THAT THERE WAS NO BREACH BY METRIC.

THE COURT: THAT'S WHAT THE WHOLE PURPOSE OF THIS HEARING IS. AT THE TIME WE'RE DONE HERE, WE'RE GOING TO ENFORCE THE SETTLEMENT. SO WHAT I HAVE SEEN SO FAR IS THAT PEOPLE ARE ARGUING ABOUT THE TERMS, AND WE'RE AT THAT POINT, AND I'M ENFORCING THE SETTLEMENT.

I DON'T THINK ANYBODY HAS BREACHED ANYTHING YET. IT WILL BE ONCE I DO AN ORDER, AND IF THE PROPERTY ISN'T TRANSFERRED, AND ALL OF THE THINGS THAT ARE NEEDED TO CLOSE IT AREN'T ACCEPTED, THEN WE HAVE A DIFFERENT PROBLEM.

BUT, MR. NELSON, ARE YOU GOING TO CLOSE THIS DEAL?

MR. NELSON: I STICK WITH MY PREVIOUS ANSWER, YOUR HONOR.

THE COURT: THAT DOESN'T COUNT. ARE YOU GOING TO CLOSE THIS DEAL?

MR. NELSON: IF YOU DETERMINE - - IF YOU PROPERLY DETERMINE THAT METRIC'S ACTIONS HAVE NOT BEEN A BREACH, I DON'T SEE THAT I HAVE ANY CHOICE.

. . . .

THE COURT: MS. SCHLICHT, WHAT DO YOU HAVE TO SAY ABOUT THAT?

-28-

MS. SCHLICHT:     ARE YOU ADDRESSING ME, YOUR HONOR?

THE COURT:     YES.

MS. SCHLICHT:     OUR POSITION HAS BEEN THAT THIS SETTLEMENT WAS REACHED IN MARCH OF 1993, AND IT WAS METRIC THAT BEGAN THIS LONG JOURNEY OF NOT WANTING TO PERFORM. THAT'S WHY WE COMMENCED THE ACTION IN WISCONSIN.

AND HOW WE GOT ON THIS TOPIC IS MR. BAKER SAYING THAT HE IS - - HIS CLIENT IS NOT OBLIGATED TO BOTH TO PERFORM AND TO ANSWER FOR DAMAGES.

WE DISAGREE AS TO METRIC'S LIABILITY.  THE FACT OF THE MATTER IS, IT'S NOW BEEN MORE THAN TWO YEARS SINCE THIS SETTLEMENT HAD BEEN REACHED, AND MR. NELSON HAS INCURRED ATTORNEY'S FEES AND OTHER ITEMS RELATING TO METRIC'S REFUSAL TO DO THIS DEAL.  WE ARGUED FOR PROBABLY 18 MONTHS ON THE ISSUE OF "AS IS."

AND I THINK THAT OUR POSITION IS THAT METRIC BREACHED THE AGREEMENT.  I THINK IT'S HARD FOR ANYONE TO ARGUE THAT METRIC HAS NOT BREACHED THE AGREEMENT, BECAUSE IT SIMPLY DIDN'T GO AHEAD WITH THE TRANSACTION AND HAS SPENT ALL THIS TIME TRYING TO COME UP FOR REASONS JUSTIFYING WHY IT HAS NOT.

. . . .

THE COURT:     LISTEN, THIS IS GETTING A LITTLE IRRITATING BECAUSE THIS IS CHANGING THE DEAL, AND WE ALL AGREED TO GO THIS WAY, AND I HAVE HAD THIS PROBLEM THROUGHOUT THIS CASE FOR TWO YEARS THAT I THINK I HAVE EVERYTHING WRAPPED UP, AND THEN PEOPLE DON'T GO ALONG WITH WHAT WE'VE DISCUSSED, AND THIS WAS A PERFECT EXAMPLE OF THAT, WHICH WAS, WE'RE GOING TO DEAL WITH ALL ISSUES NOW AND THEN DECIDE THEM.

MR. PERILLAT:     EXCUSE ME, YOUR HONOR.

THE COURT:     NOW YOU'RE TRYING TO CREATE A LOOPHOLE THAT I DON'T THINK EXISTS.

The proceedings in California stalled, and the center of action moved to Nashville.  Armed with what he correctly believed was a breach of contract by Metric, Nelson apparently determined that he could, thereafter, resort to any type of obstructionist tactics and continue, by such tactics, to increase his damages.  In deposition on December 7, 1995 in the case at bar, Kenneth Nelson testified:

AT THE PRESENT TIME, SIR, THERE'S AT LEAST A DRAFT OF SETTLEMENT AGREEMENTS THAT HAVE BEEN NEGOTIATED BACK AND FORTH, AND THERE ARE SOME ISSUES LEFT OUTSTANDING THAT

-29-

WE'RE APPARENTLY GOING TO VISIT JUDGE CAHILL ABOUT. ASSUMING JUDGE CAHILL RULES ON THE ISSUES THAT REMAIN OPEN AT THE PRESENT TIME, DO YOU INTEND TO GO FORWARD AND SELL THE PROPERTY TO METRIC ON THE TERMS AS SET FORTH IN THE DOCUMENTS AND AS DECIDED BY JUDGE CAHILL?

A.      NO.  JUDGE CAHILL SAID HE'S NOT GOING TO DECIDE THE ISSUE OF BREACH, AND WITHOUT DECIDING THE ISSUE OF BREACH, YOU CAN'T COMPEL SPECIFIC PERFORMANCE.

Q.      SO REGARDLESS OF WHAT JUDGE CAHILL'S POWERS ARE, AND WHATEVER THEY MIGHT BE, NO MATTER HOW HE RULES ON THESE OPEN ISSUES, YOU DON'T INTEND TO SELL THE PROPERTY; IS THAT CORRECT?

A.      THAT'S CORRECT.  I DON'T INTEND TO SELL IT ON THE TERMS OF THOSE DOCUMENTS.

Q.      AND AS DECIDED BY THE JUDGE?

A.      RIGHT.  AS I UNDERSTAND IT, HIS DECISION WILL - - MAY AFFECT THE AMOUNT OF DAMAGES, BUT IT WILL NOT AFFECT LIABILITY.

It is well to remember that all of these events occurred before Hardage undertook to execute on his judgment in the fraudulent conveyance action, which execution occurred in the summer of 1996.  It was not until later in 1996 that the first mortgage on the property was foreclosed and the property sold to WBL II Real Estate Ltd. Partnership for $9,050,000.00.  Far from attempting to mitigate his damages following the Metric breach of the March 23, 1993 settlement agreement, Nelson embarked upon a studied campaign to increase his damages.  He was not content with the benefit of his bargain and consequential damages.

Despite the seemingly endless thicket of paper, this case is, after all, a breach of contract action in which all parties agree that California substantive law governs.  California Civil Code section 3307 (1997) provides: "**Breach of agreement to purchase real estate.**   The detriment caused by the breach of an agreement to purchase an estate in real property is deemed to be the excess, if any, of the amount which would have been due to the seller under the contract over the value of the property to him or her, consequential damages according to proof, and interest."  Such damages are generally determined as of the date of the breach of the contract.  *Royer v. Carter*, 233 P.2d 539, 542-43 (Cal. 1951).

The first issue asserted by Nelson on appeal is that "[t]he Trial Court erred in failing to allow recovery of damages based upon the value of the land as of the date Metric's obstruction of the sale of the Land ceased."

Nelson then asserts that Metric, from and after the settlement agreement of March 23, 1993 until the Hardage lien execution sale of July 24, 1996, obstructed the sale of the Nashville property.  If such is in fact true, an exception to the California "benefit of the bargain" rule that damages are determined as of the date of breach of contract allows for calculation of such damages at a later date.

-30-

Under section 3307, the value of the property to the seller is ordinarily the market value of the property at the date of the breach. *Royer v. Carter*, 233 P.2d at 550. This rule necessarily presupposes that the vendor is free to use or dispose of the property on that date. Accordingly, if the vendee has interfered with the vendor's freedom in this respect by retaining possession or asserting an interest in the property, the vendor may include any additional damages caused thereby in the amount necessary to give him the benefit of his bargain. (*See. Id.*; *Honey v. Henry's Franchise Leasing Corp.*, 415 P.2d 833, 836 (Cal.1966)).

Under this same exception to the general rule, it is held that a vendor "may recover as consequential damages any diminution in value at the time of trial providing it can establish that it diligently attempted to resell the property from the date of breach forward and that the lis pendens rendered the property unmarketable." *Askari v. R & R Land Co.*, 179 Cal.App.3d 1101, 1110 (Cal.Ct.App. 1986); *see also Spurgeon v. Drumheller*, 174 Cal.App.3d 659, 664 (Cal.Ct.App. 1985).

The trouble with Nelson's argument is that one is hard put in this record to determine exactly when the obstructionist tactics of Metric ceased and those of Nelson himself began. What is clear is that at least as early as December 7, 1995 it was the obstruction of Nelson, and not that of Metric, that prevented consummation of the sale.

Throughout all these proceedings the only "sale" ever alleged or mentioned by anybody is the proposed sale by Nelson to Metric of the Nashville property in conformity with the March 23, 1993 California settlement. Indeed all of the discussions about "interference" or "obstruction" on the part of anybody must necessarily have been limited to this particular sale since Nelson made no effort to amend his Third Party Complaint in the case at bar to allege interference with other efforts at sale of the property until April of 2002, nearly six years after the execution sale under the Hardage lien.

While reported decisions generally refer to the "duty" of a plaintiff to mitigate his damages, it is more accurate to state the rule in terms of causation. Professor Corbin says:

> It is not infrequently said that it is the "duty" of the injured party to mitigate his damages so far as that can be done by reasonable effort on his part. Since there is no judicial penalty, however, for his failure to make this effort, it is not desirable to say that he is under a "duty." His recovery against the defendant will be exactly the same whether he makes the effort and mitigates his loss, or not; but if he fails to make the reasonable effort, with the result that his injury is greater than it would otherwise have been, he cannot recover judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the loss that he helped to cause by not avoiding it.

Arthur Linton Corbin, Corbin on Contracts, Vol. 11 § 1039, (interim ed. 1979). The Restatement of Contracts adopts and expands on the reasoning of Professor Corbin:

> d. It is not infrequently said that it is the "duty" of the injured party to mitigate damages so far as that can be done by reasonable effort on his part. Since

his legal position is in no way affected by his failure to make this effort, however, it is not desirable to say that he is under a "duty." His remedy will be exactly the same, whether he makes the effort and avoids harm or not. But if he fails to make the reasonable effort with the result that his harm is greater than it would otherwise have been, he cannot get judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the harm that a reasonable man in his place would have avoided.

Restatement of Contracts, § 336(d) (1932).

In California it has been held:

Typically, the rule of mitigation of damages comes into play when the event producing injury or damage has already occurred and it then has become the obligation of the injured or damaged party to avoid continuing or enhanced damages through reasonable efforts. For example, a landowner should avoid the certain loss of trees and crops by reasonably irrigating the land while a dispute over the contract price of water is resolved. (*Henrici v. South Feather Land, Etc., Co.* (1918), 177 Cal. 442, 170 P. 1135). An owner's recovery for deprivation of use of a damaged vehicle is limited to the time reasonably required for making the necessary repairs. (*Valencia v. Shell Oil Co.*, 23 Cal.2d at p. 844, 147 P.2d 558). One has an obligation to avoid an unwarranted enhancement of damages 'through passive indifference or stubborn insistence upon a conceived legal right . . . ' (*Green v. Smith*, (1968) 261 Cal.App.2d 392, 398-99, 67 Cal.Rptr. 796).

*Valle De Oro Bank v. Gamboa*, 32 Cal.Rptr.2d 329, 332 (Cal.Ct.App. 1994). California clearly recognizes that proximate causation of the claimed damages is the controlling consideration. "The essence of the rule denying recovery for losses which could have been prevented by reasonable efforts and expenditures of plaintiff is that his conduct rather than that of defendants proximately caused such losses." *Valencia v. Shell Oil Co.*, 147 P.2d 558, 561 (Cal. 1944).

The element of proximate causation, as it relates to mitigation of damages, applies in both tort and contract, and the rule is stated in the context of employer-employee relations by the Court of Appeals of California:

The issue has also been discussed in terms of a duty on the part of an employee to minimize his loss. Thus Judge Cardozo stated:

" 'The servant is free to accept employment or reject it according to his uncensored pleasure. What is meant by the supposed duty is merely this: That if he unreasonably reject, he will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge. He has broken the chain of causation, and loss resulting to him thereafter is suffered through his own act.' (*McClelland v. Climax Hosiery Mills* (1930) 252 N.Y. 347, 359, 169 N.E. 605,

-32-

609, concurring opinion.)" (*Parker v. Twentieth Century-Fox Film Corp., supra*, at p. 185, fn. 1, 89 Cal.Rptr. at p. 743, 474 P.2d at p. 695.)

*California Sch. Employees Ass'n v. Pers. Com'n*, 106 Cal.Rptr. 283, 288 (Cal.Ct. App. 1973). Further, the rule of mitigation applies with equal force whether damages are calculated under California Civil Code section 3300 or California Civil Code section 3307. *Brandon & Tibbs v. Kevorkian*, 277 Cal.Rptr. 40 (Cal. 1990).[5]

Trying to bring into focus the ever changing assertions of Nelson as to a measure of damages is like tracking a chameleon through the Shenandoah Valley in autumn.

Apparently conceiving that his "benefit of the bargain" damages would be minimal due to the highly leveraged financial structure underlying the Nashville property and the inhibitions on marketability caused by the Hardage lis pendens lien, Nelson disavowed the "benefit of the bargain" rule[6] and sought special damages based on other considerations. All of these special damages assertions and the further assertion that the *Askari* exception to California's benefit of the bargain rule applies so as to extend diminution in value from the time of breach to the time of trial are based upon assumptions of fact that are not borne out by the record. First and foremost, it is Nelson, not Metric, that is responsible for the existence of the Hardage lien lis pendens in the first place. It was his 1986 conveyance from Nashville Residence Corporation to Nashville Lodging Company that inhibited the marketability of the Nashville property and constituted the Nashville title problem.

Secondly, he asserts that Metric was obligated to pay the Hardage lien on the Nashville property thereby exonerating Nelson. Metric has no such obligation as it was not a party to the alleged fraudulent conveyance and did not assume, contractually or otherwise, responsibility for payment of the Hardage lien. The entire transaction was purely contractual with no equitable obligation to Nelson. The land, of course, was encumbered by the Hardage lien, and no action by Metric would have been effective to insulate the land from execution to satisfy the Hardage lien. This is clearly in keeping with rules stated *In re Estate of Vincent*, 98 S.W.3d 146 (Tenn. 2003). While it is true, as it was in *Vincent*, that as a practical matter Metric might be compelled to satisfy the Hardage lien in order to keep from losing its own investment, this does not mean that Metric was under any obligation, legal or otherwise, to Nelson. The land stands between the Hardage lien and Nelson, but it is Nelson, not Metric, who would be liable for the Hardage judgment over and above the amount realized from the sale of the property on lien foreclosure. *Hussey v. Ragsdale*, 831 S.W.2d 279 (Tenn. 1992).

---

[5] The measure of damages applicable in this case is provided by California Civil Code section 3307 and not by California Civil Code section 3300. Like section 3306 is a special statute concerning breach of an agreement to convey real property, so section 3307 is a special statute providing the measure of damages for breach of an agreement to buy real property. The special statute prevails over the general contract breach statute. Cal.Civ.Code § 3300; *Crag Lumber Co. v. Crofoot*, 301 P.2d 952, 966-67 (Cal.Ct.App. 1956).

[6] The "benefit of the bargain" rule in California is restricted and, depending on changes in value between the date of the contact and the date of the breach thereof, can be illusory. *See Spurgeon*, 220 Cal.Rptr. 195.

Thirdly, the *Askari* exception to the California "benefit of the bargain" rule only applies if Metric has interfered with Nelson's efforts to resell the property and Nelson has diligently attempted to do so after the date of the breach. The record clearly shows in this case that not only did he make no diligent effort to resell the property, from at least December 7, 1995 forward, he did everything he possibly could to frustrate the sale to Metric under the March 23, 1993 California Settlement Agreement, that proposed sale being the only sale on the horizon. It is also well to note that the lis pendens in the case at bar did not result from any action by Metric, but rather from the action of Hardage in attempting to set aside a fraudulent conveyance made by Nelson.

The case at bar started on June 23, 1994 when Hardage filed this action against Nelson to subject the land under the Nashville Marriott Residence Inn to a judicially supervised sale in order to satisfy the Hardage federal court judgment against Nelson. On May 5, 1995, Nelson responded to the Complaint and filed a Third Party Complaint against Metric. The initial Third Party Complaint sought a judgment against Metric for the cost of defending the fraudulent conveyance action then pending before Part III of the Chancery Court of Davidson County in case no. 92-3086-III. It further sought judgment against Metric for the cost of defending the present action by Hardage together with indemnification for any loss resulting from the claims of Hardage. These claims were correctly dismissed by the chancellor since Metric owed no duty to Nelson to pay the Hardage lien or to indemnify Nelson for any loss resulting from the claims of Hardage. Metric further had no duty to defend a fraudulent conveyance action relative to the 1986 deed, to which it was not a party.

All of the damages sought in the original third party complaint are premised upon the erroneous assumption that Metric had some duty to Nelson to satisfy Hardage. When Metric agreed to take the property from Nelson "as is," it did not assume the Hardage lien lis pendens, and Metric's only duty to either Hardage or Nelson was to refrain from acting in any manner that would adversely affect the right of Hardage to subject the land to his lis pendens lien. This is the rule evidenced by *In re Estate of Vincent*, 98 S.W.3d 146, and the fact that self-preservation may have forced Metric to choose between paying the Hardage lien or losing its own investment is immaterial to any issue between Metric and Nelson.

On January 9, 1998, Nelson amended his Third Party Complaint to allege that he was entitled to:

> 5. A judgment against Metric for the cost, including attorney's fees, of this action against Metric and of any action related to the claims or actions of ORL against 2300 Elm Hill or NLC (including without limitation the arrest of Kenneth E. Nelson ("Nelson") for allegedly hindering a secured creditor and Nelson's claims against Eugene N. Bulso, Jr.) or of 2300 Elm Hill or NLC against Metric or any person related to Metric;
> 6. A judgment against Metric for the value of the land once owned by NLC (the "Land") which has been lost to ORL;
> 7. A judgment against Metric for the value of NLC's judgment in Case NO. 92-1615 in the United States District Court for the District of Columbia;

8. A judgment against Metric for the cost of Nelson's time and efforts on behalf of NCL in this litigation and other litigation which has resulted from Metric's breach of settlement agreement;

9. A judgment against Metric for the loss of rents on the Land;

10. A judgment against Metric for the loss of payments on a note in the original principal amount of $9,250,000.00 on which Metric is the payor and NLC is the payee;

11. A judgment against Metric for such other consequential damages as may be proven at trial;

12. A judgment against Metric for the decrease in the value of the interest in NLC of 2300 Elm Hill Pike, Inc.'s;

13. A judgment against Metric in the amount of Metric's judgment in Case No. 96-1405-III in the Chancery Court for Davidson County, Tennessee;

14. A judgment against Metric for prejudgment interest on all losses suffered by third-party plaintiffs; . . . .

None of these alleged damages were proximately caused by any action of Metric but rather by the actions of Nelson, at least from and after December 7, 1995, in refusing to consummate the March 23, 1993 California Settlement Agreement or otherwise market the property. It may be logically assumed that the marketability of the property was severely inhibited by the Hardage lis pendens lien and the fraudulent conveyance action, but Metric was neither obligated under the settlement contract to discharge the Hardage lien nor to defend the fraudulent conveyance action.

It was on this basis that on December 10, 1998 the trial court granted Metric's Motion for Partial Summary Judgment dismissing Nelson's claim for the alleged "loss of the land and attorney's fees required to defend the claim of Hardage." With its primary claim for damages, all premised upon the erroneous assumption that Metric had a duty to Nelson to discharge the Hardage liens and defend the fraudulent conveyance actions, having been dismissed by the chancellor, Nelson asserted, on February 15, 1999, a claim of damages "for loss of the benefit of the bargain" in the amount of 1.6 million dollars. This claim was based on the assertion that the value of the land as of the time of the foreclosure of the Hardage lis pendens lien was $100,000.00 or 1.6 million dollars less than the face value of the non-recourse note contemplated in the March 23, 1993 settlement.

On April 5, 2002, Nelson again moved to amend his Complaint to assert that Metric had restricted, interfered with, impaired and impeded the ability of Nelson to sell the land. This Motion also sought to amend the Complaint to allege that damages for the benefit of the bargain should be computed not as of the date of the breach but, rather, as the date of the trial. This Motion to Amend was denied by the court on May 29, 2002.

At this stage the case was ready for appeal except for the continuing dispute as to whether the *Askari* exception to the benefit of the bargain rule was applicable so as to extend the diminution of value date from the date of the alleged breach to the date of trial. With the concurrence of all parties, the trial court entered the following Order on September 3, 2002:

This matter comes before the Court upon agreement of the parties, NASHVILLE LODGING COMPANY ("NLC"), GP CREDIT CO., LLC ("GP Credit") and METRIC PARTNERS GROWTH SUITE INVESTORS, L.P., ("Metric") as evidenced by the signatures of their respective counsel below. It is, therefore, ordered and adjudged as follows:

1.      Third-Party Plaintiffs, GP Credit and NLC hereby irrevocably and unconditionally waive and relinquish any and all remaining claims that have not been adjudicated previously by this Court and that could be asserted at the trial of this case, including, but not limited to, their claim for loss of benefit of the bargain damages measured as of the date of breach of the Agreement by Metric. Third-Party Plaintiffs reserve for appeal all claims previously dismissed by the Court, including, but not limited to, claims for the loss of benefit of the bargain damages measured as of the date of trial.

2.      In light of the foregoing waiver of the only remaining issues at trial in this matter, this Court's orders previously entered in this case are hereby rendered final in accordance with T.R.Civ.P. 54.

For reasons already stated, the *Askari* exception is not applicable, and, under the California benefit of the bargain rule, diminution in value must be assessed as of the date of the breach of contract and not the date of trial. Nelson having waived this issue and the record being devoid of any proof as to such measure of damages, the action of the trial court on this issue will be affirmed.

The remainder of the Nelson case on appeal is an anti-climax. Much effort is expended by all parties relative to the Metric strategy memo dated September 18, 1995. The trial court, in its order of May 22, 2002, held that the strategy memo was privileged under the attorney work product rule and had been inadvertently disclosed. It further held that the attorney's memos "are not relevant to any issue to be tried in this case." The trial court was correct in its finding as to relevancy. Whether the Metric strategy memo was privileged and whether or not the privilege had been waived by Metric are insignificant to the issues remaining before the Court. The strategy memo was not prepared until September 18, 1995, more than a year after Metric had breached the March 23, 1993 California Settlement Agreement. By the time of the preparation of the strategy memo, it was Nelson who had embarked upon the path of obstruction of the settlement, not Metric. As Nelson stated in his May 24, 1995 testimony before Judge Cahill:

> THE COURT:        THAT'S WHAT MR. BAKER STARTED OFF SAYING IS THAT HE BELIEVES MR. NELSON IS NOT GOING TO GO THROUGH WITH THE SETTLEMENT.
>
> . . . .
>
> THE COURT:        MR. NELSON WAS THERE.  WHAT DO YOU HAVE TO SAY MR. NELSON?
> MR. NELSON:        THIS IS KEN NELSON.
> MY UNDERSTANDING IS THAT METRIC REFUSED TO BUY THE LAND THEREBY BREACHING THE AGREEMENT, AND, AS I

-36-

UNDERSTAND IT - - YOU KNOW, I'M NOT A LAWYER - - THAT MEANS THAT PERFORMANCE OF THE OTHER PARTIES IS EXCUSED.

Finally, Nelson argues that the trial court erred in denying leave to amend the Complaint alleging interference with Nelson's ability to sell the land in Nashville and seeking to amend his allegations of damages. When the court denied this application for leave to amend it held:

Based upon the pleadings, argument of counsel, and the record in this cause, the Court finds that the motion should be denied. In denying the motion, the Court has considered the various factors relevant to Plaintiffs' motion, as outlined by Tenn. R. Civ. P. 15.01 and cases decided under it. The Court finds that Plaintiffs' Motion to Amend, filed seven years after the filing of the Third-Party Amended Complaint in this case and after the completion of discovery, is untimely. The Court finds that allowing the Plaintiffs to amend their Complaint at this time would be prejudicial to Metric, and could potentially require a rescheduling of the trial of the case, currently scheduled to begin on September 16.

The Court further finds that the proposed amendment would be futile. The Court notes that the new allegations are based largely, if not exclusively, upon a series of memos prepared by Metric's counsel years after the settlement agreement at issue in this case. The Court finds that the memos are not relevant to the claims as currently pled, and would not be relevant even if the proposed amendment were allowed. The Court also finds that the prejudicial effect of the memos outweighs any probative value, rendering the memos inadmissible under Tenn. R. Ev. 403. Finally, the Court finds that allowing the proposed amendment would be contrary to previous rulings of the Court.

For all of these reasons, the motion of Third-party Plaintiffs Nashville Lodging Company and GP Credit Co., LLC to amend the Comparing is accordingly DENIED.

The trial court obviously did not abuse its discretion in denying this belated application by Nelson to once again amend his Complaint. *March v. Levine*, 115 S.W.2d 892 (Tenn.Ct.App. 2003).

CONCLUSION

It is asserted by both parties on appeal that a number of the Orders in the trial court in this protracted litigation are inconsistent with each other and perhaps contradictory to each other. It would be difficult indeed for any trial court to handle this litigation without making some mistakes and falling into error. The result reached by the trial court is correct, and the alleged errors asserted by both parties are harmless.

The alpha and omega of all the problems in this case was Nelson's conveyance of the Nashville real estate in 1986. Metric, thereafter, entered into a contract with Nelson in California and soon afterwards realized that it had made a mistake. Metric deliberately breached the California Settlement Agreement and, in the normal course of events, would thus be required to suffer the consequences. Nelson was not content with the measure of damages available to remedy the Metric

breach and thereafter embarked upon a course of obstruction. He waived his proper measure of damages and then sought damages based upon the erroneous assumption that Metric owed him a duty to discharge the Hardage liens. In the course of his conduct he sought to exacerbate rather than mitigate his damages. Metric has no duty to Nelson to discharge the Hardage lien, and all the damages sought by Nelson are the proximate result of his own conduct and not that of Metric.

The judgment of the trial court is in all respects affirmed, and costs are assessed against Nashville Lodging Company.


_____

WILLIAM B. CAIN, JUDGE